Filed 3/28/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MEDALLION FILM LLC et al., | B323356 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 21STCV45129) |
| v. | |
| LOEB & LOEB LLP, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Randolph Hammock, Judge.  Judgment vacated; reversed and remanded with directions.

Eanet, Matthew L. Eanet; Benedon & Serlin, Gerald M. Serlin and Wendy S. Albers, for Plaintiffs and Appellants.

Hueston Hennigan and Robert N. Klieger for Defendant and Respondent.

————————————

Plaintiffs Medallion Film, Pelican Point Capital Partners (Pelican Point), Jesse Kennedy, Shad Quraishi, and Ike Suri appeal from the judgment in favor of Loeb & Loeb following the trial court's order granting a special motion to strike their first amended complaint. (Code Civ. Proc.,[1] § 425.16.) We vacate the judgment, reverse the order granting the special motion to strike, and remand with directions to enter a new order denying the motion.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2014, William Sadleir, as the manager of Clarius Capital Group (Clarius), entered into a consulting fee agreement with plaintiffs Medallion Film and Pelican Point providing that Medallion Film and Pelican Point would assist Clarius in obtaining funding for film projects, and Clarius would pay them a portion of any funding so obtained. Clarius agreed not to directly conduct business or transactions with any of the contacts to whom it was introduced by Medallion Film and Pelican Point. Medallion Film and Pelican Point introduced Clarius to Randy Robertson at BlackRock, one of their contacts listed in the agreement.

Sadleir is alleged to have dissolved Clarius and its affiliate and subsidiary entities in 2015, and to have formed, with the assistance of law firm Loeb & Loeb, a new set of corporate entities under the name Aviron in order to continue marketing Clarius's film properties. It is alleged that Sadleir controlled

---

[1] All undesignated statutory references are to the Code of Civil Procedure.

2

both the Clarius and Aviron entities, and that he transferred Clarius's assets to the Aviron entities.

Later in 2015, Aviron is alleged to have obtained a loan for its film projects from BlackRock, with a further extension of the credit arrangement in 2017. When Medallion Film and Pelican Point learned of this funding in 2017, they allegedly contacted Sadlier, who denied any affiliation between Aviron and Clarius and said he was solely an employee of Aviron.

On March 25, 2018, plaintiff Quraishi, Pelican Point's co-founder, sent an email to Randy Robertson at BlackRock. This message read, "Randy hope all is well. [¶] We have a fee agreement with Bill Sadle[i]r based upon monies raised from Blackrock thru my introduction to you. What can you do to assist us here in collecting what is due to us. [¶] Jesse [Kennedy, of Medallion] will provide a reconciliation. As you know our financial models were provided to you and Blackrock on the P&A. [¶] Let us know so we don[']t have to litigate and can resolve the matter in an amicable fashion. [¶] Thx."

Loeb & Loeb learned of the Quraishi email request to Robertson. On March 28, 2018, Loeb & Loeb partner Bernard Given II wrote a letter to Quraishi and Kennedy on behalf of Aviron Capital. Given described Quraishi's email to Robertson as a threat of legal action, and wrote, "Aviron has no legal connection to Clarius Capital Group, LLC whatsoever. It is not a successor in interest and there is no common ownership between the two companies. Mr. Sadleir, who signed the referenced agreement on behalf of Clarius Capital Group, is an Aviron employee with no ownership interest in Aviron. Had Mr. Sadleir left Clarius to work at Sony Pictures Entertainment, for example, your claim for payment to you by Sony, had it received funding

3

from BlackRock, would be equally without merit. [¶] Any further communication by you to Randy Robertson or anyone else at BlackRock regarding this matter will be considered by Aviron to constitute tortious interference."

Plaintiffs allege Given knew these representations were false when he made them because Loeb & Loeb had assisted in the formation of the Aviron entities, registered several of them on Sadleir's behalf, advised Sadleir with respect to Aviron and Clarius, and represented Aviron when it obtained funding from BlackRock in 2015. Plaintiffs allege Given intended for Medallion Film and Pelican Point to rely on his false representations to conclude they were not entitled to payment under their agreement with Clarius.

Plaintiffs allege they believed Given's representations that Aviron and Clarius were unaffiliated, Sadleir was merely an Aviron employee, and they were not entitled to payment based on the agreement. However, in December 2019, they learned, from documents related to litigation between BlackRock and Sadleir/Aviron, that Given's representations were false.

Plaintiffs sued Loeb & Loeb in December 2021. The first amended complaint alleges causes of action for fraudulent misrepresentation, deceit by concealment, negligent misrepresentation, aiding and abetting fraud, and violating California Business and Professions Code section 17200.[2] The plaintiffs attached to the first amended complaint, inter alia, the following documents:

---

[2] The Business and Professions Code cause of action was later withdrawn.

--The 2014 consulting agreement between plaintiffs and Clarius;

--The Second Amended and Restated Limited Liability Company Agreement of Aviron Group, alleged to be the parent company of the Aviron entities, revising Sadleir's ownership from l00 percent down to 10 percent of the company, with Temerity Trust Management (of which Sadleir was identified as manager) owning 80 percent and a BlackRock subsidiary owning the remaining 10 percent;

--Limited liability company agreements for two Aviron subsidiaries, each providing Aviron Group owned the company in its entirety and that Sadleir would control and manage all the company's business affairs as manager;

--The October 2015 Credit and Security Agreement between BlackRock and Aviron Capital, specifying that one of the conditions precedent to the effectiveness of the agreement was "a favorable opinion of Loeb & Loeb LLP, counsel to the Loan Parties," and requiring correspondence to Aviron to be copied to the firm;

--The agreement extending the BlackRock credit arrangement in 2017, specifying as a condition precedent a favorable opinion from Loeb & Loeb, counsel for Aviron entities and/or subsidiaries;

--An Equity Pledge Agreement signed in October 2015 by Sadleir, as president of Aviron Group, pledging Aviron Group's equity interests in subsidiaries Aviron Capital and Aviron Pictures as collateral for the funding agreement with BlackRock;

--A 2017 omnibus amendment to Aviron's agreement with BlackRock, signed by Sadleir as manager of Aviron Pictures and MAA Releasing and president of Aviron Group;

--Two 2019 agreements to advance funds to Aviron Capital against the credit extended by BlackRock, signed by Sadleir as manager of Aviron Capital and Temerity Trust Management, and pledging Sadleir's personal interest and Temerity Trust's interest in Aviron Group as collateral;

--Executive summaries for Aviron Pictures and Clarius, in which Sadleir is identified as chairman, the companies' business models are described in similar terms, and a number of management personnel are the same for both companies;

--2015 letters to Loeb & Loeb confirming the good standing of two Aviron subsidiaries;

--A 2017 California Application to Register a Foreign Limited Liability Company filed for an Aviron company by a person alleged to be a Loeb & Loeb paralegal;

--The December 2019 complaint by BlackRock against Sadleir and the Aviron entities in New York, describing the Aviron entities' structure, ownership, control, and agreements with BlackRock;

--A 2019 preliminary injunction in the BlackRock litigation, prohibiting Sadleir and the Aviron entities from holding themselves out as manager of, or controlling, or purporting to control, the operations of Aviron Capital and Aviron Pictures;

--BlackRock's 2020 amended complaint alleging Sadleir had created a sham entity and used it to siphon millions of dollars from BlackRock's Multi-Sector Income Trust for his personal use in an elaborate fraud; and

--A text message asserted to have been sent in January 2020 by Sadleir to an officer at Medallion, in which Sadleir confirmed he still owned the Aviron entities in their entirety.

## I. The Anti-SLAPP Motion

Loeb & Loeb filed a special motion to strike the first amended complaint as a strategic lawsuit against public participation under section 425.16 (an "anti-SLAPP" motion). Loeb & Loeb claimed the plaintiffs' causes of action were all based on the representations in Given's letter, and they arose from protected activity because the letter had been "sent in express response to Plaintiffs' threat of legal action to recover amounts purportedly due under the Consulting Fee Agreement, and therefore in connection with a contemplated lawsuit."

Loeb & Loeb argued plaintiffs could not establish a probability of success on their claims. First, Loeb & Loeb asserted the litigation privilege provided an absolute defense to all of the causes of action because Given's letter was sent "in direct response to Quraishi's email threatening legal action," with the belief that plaintiffs "were actually contemplating litigation, seriously and in good faith," and the alleged misrepresentations related to plaintiffs' "anticipated claims for fees." Second, Loeb & Loeb contended the causes of action were barred by the three-year statute of limitations. Even applying the discovery rule, because plaintiffs suspected in 2018 that Sadleir controlled Aviron, plaintiffs were obligated to investigate. Their investigation was "minimal at best," as they only contacted Sadleir and BlackRock, then stopped inquiring about payment upon receiving Sadleir's denial and Given's letter. This, Loeb & Loeb claimed, was not reasonable diligence as a matter of law.

Loeb & Loeb argued that if plaintiffs had searched publicly available records and made record requests, with "a few simple internet searches," they would have found a press release and Canadian government filings relating to an unrelated company's

7

dealings with Aviron, several online articles, and Aviron's website, and they would "readily have discovered not only that Sadleir controlled Aviron, but also all of the other information that was supposedly 'unearthed' during the BlackRock lawsuit." Given all that plaintiffs knew or should have discovered through investigation, Loeb & Loeb argued their causes of action accrued in March 2018 and were time-barred as a matter of law.

Third, Loeb & Loeb contended plaintiffs could not prove justifiable reliance on Given's representations as a matter of law because it is unreasonable to rely on an adversary's representations under California law. Because plaintiffs believed Sadleir controlled Aviron and they were therefore entitled to payment under the consulting agreement, even "threaten[ing] legal action on that basis," it was unreasonable as a matter of law for them to accept and rely on Sadleir and Given's denials without independent inquiry.

Finally, Loeb & Loeb claimed the cause of action for aiding and abetting fraud was barred by the agent's immunity rule.

The special motion to strike was supported by various documents and Given's declaration. He stated he wrote the letter in response to Quraishi's "threat of legal action, which I [Given] regarded as having been made in serious and good faith contemplation of litigation." Given declared he believed his statements in the letter to be true at the time based on confidential communications and information received in the course of representing Aviron.

II.  **Plaintiffs' Opposition to the Anti-SLAPP Motion**

In their opposition to the special motion to strike, plaintiffs argued Loeb & Loeb had not met its burden of showing the claims arose from protected activity because Given's conduct was

8

unlawful as a matter of law and no litigation was seriously being contemplated in good faith at the time he wrote his letter. Even if the claims did arise from protected activity, plaintiffs argued they had a probability of success on the merits because the litigation privilege did not attach to Given's letter, as litigation was at most a future possibility and Given had not sent the letter in good faith and in serious consideration of litigation.

Plaintiffs argued the statute of limitations had not expired because their claims did not accrue until December 2019, when BlackRock sued Aviron and Sadleir. In support of this argument, plaintiffs submitted evidence that they relied on Given's representations to believe they were not entitled to payment because of "Loeb's sole access at the time to the material facts regarding Sadleir's business dealings and the relationship between the Aviron and Clarius Entities." They declared they later learned from documents from the BlackRock litigation that Given had known his representations in the March 2018 letter to be false. The documents revealed Loeb & Loeb knew Sadleir controlled the Aviron entities because the firm had advised Sadleir with respect to the BlackRock funding.

Plaintiffs also argued they had demonstrated justifiable reliance on Given's representations, and the agent's immunity rule did not apply.

III. **The Trial Court's Ruling**

On July 12, 2022, the trial court granted the special motion to strike. With respect to the first prong of the anti-SLAPP analysis, whether the claim arises from protected activity, the court found all plaintiffs' causes of action arose from Given's letter. The court found plaintiffs' evidence was "certainly not insubstantial and raises a reasonable doubt as to whether Given

9

was truly ignorant of his letter's falsity." However, for activity to be considered unprotected unlawful conduct, the illegality of the conduct in question must be conceded or conclusively established by the evidence, neither of which was the case; and because no showing of good faith/serious consideration of litigation was required, Loeb & Loeb met its burden of demonstrating the letter was sent in connection with anticipated litigation.

On the second prong, the court concluded plaintiffs had not demonstrated a probability of prevailing on the merits because the litigation privilege barred each cause of action. Although this was dispositive of the motion, the court analyzed the remaining prong 2 arguments "for discussion purposes" and concluded the causes of action were not barred by the statute of limitations, there was no evidence plaintiffs' investigation could have revealed Given's representations were false, and the agent's immunity rule did not apply.

At the hearing, the trial court said it did not like the result and it believed the outcome was "probably not" fair. The court encouraged plaintiffs to appeal because if Given knowingly and maliciously lied, plaintiffs "should be able to sue them for that."

The trial court struck the first amended complaint in its entirety and entered judgment in favor of Loeb & Loeb. Plaintiffs appeal.

## DISCUSSION

### I.    The Anti-SLAPP Law

"The anti-SLAPP statute is 'designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern. [Citations.] To that end, the statute authorizes a special motion

10

to strike a claim "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).)' " (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1008–1009 (*Bonni*).)

Litigating an anti-SLAPP motion is a two-step process. "First, 'the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.' [Citation.] Second, for each claim that does arise from protected activity, the plaintiff must show the claim has 'at least "minimal merit." ' [Citation.] If the plaintiff cannot make this showing, the court will strike the claim." (*Bonni*, *supra*, 11 Cal.5th at p. 1009.)

We review de novo a trial court's order granting an anti-SLAPP motion, considering the pleadings and affidavits submitted in support of, or in defense to, the subject claims. (*Flickinger v. Finwall* (2022) 85 Cal.App.5th 822, 831 (*Flickinger*).)

## II.  **First Prong**

The first question is whether the plaintiffs' claims arise from protected activity. To determine this, we " 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.' [Citation.] The defendant's burden is to identify what acts each challenged claim rests on and to show how those acts are protected under a statutorily defined category of protected activity." (*Bonni*, *supra*, 11 Cal.5th at p. 1009.)

Loeb & Loeb asserts the causes of action are all based on activity protected by section 425.16, subdivision (e)(2). We

11

independently determine whether any of the acts from which challenged claims arise are protected under this provision. (*Bonni, supra*, 11 Cal.5th at p. 1009.)

A.     Applicable Law

Section 425.16, subdivision (e) identifies four categories of conduct that are protected under the anti-SLAPP statute, one of which is a "written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law."  (§ 425.16, subd. (e)(2).)  Although the statute refers to ongoing proceedings, as this court and many others have held, "[p]relitigation communications may qualify for this protection so long as they ' "concern[] the subject of the dispute" and [are] made "in anticipation of litigation 'contemplated in good faith and under serious consideration.' " ' " (*Flickinger, supra*, 85 Cal.App.5th at pp. 832–833; see also *Trinity Risk Management, LLC v. Simplified Labor Staffing Solutions, Inc.* (2021) 59 Cal.App.5th 995, 1005 (*Trinity*); *People ex rel. Allstate Ins. Co. v. Rubin* (2021) 66 Cal.App.5th 493, 499 (*Rubin*); *Nirschl v. Schiller* (2023) 91 Cal.App.5th 386, 401–402 (*Nirschl*); *Bel Air Internet, LLC v. Morales* (2018) 20 Cal.App.5th 924, 940–941 (*Bel Air*); *People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 824 (*Anapol*); *Aguilar v. Goldstein* (2012) 207 Cal.App.4th 1152, 1162; *Digerati Holdings, LLC v. Young Money Entertainment, LLC* (2011) 194 Cal.App.4th 873, 887; *Bailey v. Brewer* (2011) 197 Cal.App.4th 781, 789–790; *Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1268.)

Loeb & Loeb disputes the existence of the good faith and serious consideration requirement, relying on *RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co., Inc.* (2020) 56 Cal.App.5th 413

(*RGC Gaslamp*), in which the court cast doubt on its appropriateness in the prong 1 analysis; and *Pech v. Doniger* (2022) 75 Cal.App.5th 443 (*Pech*), which did not set forth an independent analysis but described *RGC Gaslamp*'s analysis as persuasive.  Loeb & Loeb overstates the scope and import of these decisions: in neither case did the court rule the good faith and serious consideration requirement no longer exists to determine whether prelitigation activity is protected.  (*Pech*, at p. 463 ["Ultimately, the *RGC Gaslamp* court was not required to decide whether the additional limitations of the litigation privilege apply in the anti-SLAPP context, and neither are we"]; *RGC Gaslamp*, at p. 429 ["We need not resolve this potential tension here"].)  "An appellate decision is not authority for everything said in the court's opinion but only 'for the points actually involved and actually decided.' " (*Santisas v. Goodin* (1998) 17  Cal.4th 599, 620.)

We respectfully disagree with the interpretation of the good faith and serious consideration requirement in *RGC Gaslamp* and *Pech*.  The *RGC Gaslamp* court was troubled by what it identified as a "potential tension" between considering whether prelitigation communications were made in good faith and serious consideration of litigation and the fact that prong 1 of the anti-SLAPP analysis "requires only a prima facie showing of protected activity, not a showing that the defendant's acts were ultimately lawful or constitutionally protected." (*RGC Gaslamp*, *supra*, 56 Cal.App.5th at p. 429.)  It expressed concern that requiring a litigant to "affirmatively show that its statements were made in good faith while litigation was seriously contemplated" would, in some instances, import into prong 1 an

13

analysis on the merits whether the statements ultimately arose from protected petitioning activity.  (*Ibid*.)

We understand this concern but think it misconstrues the showing of good faith and serious consideration of litigation that is required.  "The 'good faith [and under] serious consideration' requirement is not a test for malice.  (*Aronson v. Kinsella* (1997) 58 Cal.App.4th 254, 266, [68 Cal.Rptr.2d 305].)  Instead, it focuses on whether the litigation was genuinely contemplated" (*Anapol*, *supra*, 211 Cal.App.4th at p. 824), and it protects prelitigation communications made in genuine contemplation of litigation while excluding from protection communications made when litigation is "just a negotiating tactic or a hypothetical possibility.  [Citations.] [¶] The requirement to show that litigation is seriously contemplated ensures that prelitigation communications are actually connected to litigation and that their protection therefore furthers the anti-SLAPP statute's purpose of early dismissal of meritless lawsuits that arise from protected petitioning activity.  (§ 425.16, subd. (a); *Anapol*, *supra*, 211 Cal.App.4th at p. 824 [the good faith and serious consideration requirement 'guarantees that hollow threats of litigation are not protected']; cf. *Action Apartment* [*Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232,] 1251 [the policy underlying the litigation privilege of affording ' "the utmost freedom of access to the courts" ' is furthered only if litigation is 'seriously considered'].)"  (*Bel Air*, *supra*, 20 Cal.App.5th at pp. 940–941.)

Additionally, *RGC Gaslamp* and *Pech* involved prelitigation activities that were intrinsically preparatory to litigation such that no analysis of surrounding circumstances was necessary to determine that they were protected prelitigation activity.  In

14

*Pech*, the communication was legal advice provided by attorneys to their clients concerning proposed litigation and the clients' obligations to their former attorney, which by definition was provided in preparation for litigation and was therefore protected prelitigation speech. (*Pech*, *supra*, 75 Cal.App.5th at p. 462.) In *RGC Gaslamp*, the prelitigation communication in question was the filing of a mechanic's lien, and the court concluded that because the filing of a mechanic's lien was a necessary prerequisite to bringing a foreclosure action, it was a protected prelitigation statement preparatory to filing a judicial proceeding. (*RGC Gaslamp*, *supra*, 56 Cal.App.5th at p. 426.)

Finally, we note that even as it questioned the good faith and serious consideration analysis in general, the *RGC Gaslamp* court recognized its utility in circumstances when determining whether an act was in anticipation of litigation is not as cut and dried as it is with a mechanic's lien: "[S]uch criteria may be helpful in evaluating prelitigation statements that do not intrinsically anticipate litigation." (*RGC Gaslamp*, *supra*, 56 Cal.App.5th at p. 429.)

B.    Application

From a review of the amended complaint, it is clear that plaintiffs' first three causes of action, for fraudulent misrepresentation, deceit by concealment, and negligent misrepresentation, are all based on Given's letter. Plaintiffs' fourth cause of action is somewhat different, and we discuss it separately below.

We independently review the contents of Loeb & Loeb's letter (*Trinity*, *supra*, 59 Cal.App.5th at p. 1005) and conclude Given's representations were not communications made in preparation for or in anticipation of litigation. From the first

15

sentence of its appellate brief, Loeb & Loeb repeatedly and hyperbolically describes the email to which Given responded as an explicit threat of litigation conclusively establishing Given's letter as anticipating litigation. But the actual message to which Given was responding was nothing of the sort. This was not a demand letter or litigation threat, and it was not even directed to Aviron. Rather, plaintiffs reached out to their contact at BlackRock—the person to whom they had introduced Sadleir pursuant to the consulting agreement—and asked for BlackRock's help in securing the payment to which they thought they were entitled: "What can you do to assist us here in collecting what is due to us[?]" They sought BlackRock's help so the question of payment could be addressed informally, "so we don[']t have to litigate and can resolve the matter in an amicable fashion." The email demonstrates the plaintiffs just wanted to be paid, and they were appealing to whomever they thought would be influential in persuading Sadleir to pay them without having to resort to litigation. This is the exact *opposite* of a threat of litigation.

While eventual litigation was a remote possibility from the mere fact that the message alerted Given that someone wanted something from Aviron, a remote possibility is not enough to demonstrate a communication is actually connected to litigation and is therefore protected. When conduct " 'will lead to litigation only if negotiations fail or contractual commitments are not honored, future litigation is merely theoretical rather than anticipated and the conduct is therefore not protected prelitigation activity.' " (*Rubin, supra*, 66 Cal.App.5th at p. 499.) Indeed, "where one party to a contract requests the other party to perform its duties under the agreement," the "possibility of

16

litigation in the event of nonperformance is not enough to conclude the claim is made in anticipation of litigation contemplated in good faith and under serious consideration." (*Anapol*, *supra*, 211 Cal.App.4th at p. 828.)

Given declared he wrote the letter in response to Quraishi's "threat of legal action, which I regarded as having been made in serious and good faith contemplation of litigation." This self-serving declaration is both insufficient on its own to establish a prima facie showing of protected activity (*Anapol*, *supra*, 211 Cal.App.4th at p. 830; *Nirschl*, *supra*, 91 Cal.App.5th at p. 403 ["one side's subjective belief that negotiations will fail or that litigation will likely occur is insufficient, standing alone, to transform statements made in a prelitigation negotiation into protected activity"]) and at obvious odds with the actual correspondence forwarded to Given. Once we dispense with the fiction that plaintiffs' email to BlackRock was an explicit threat of litigation against Aviron, Loeb & Loeb offers no evidence that Given wrote his letter in good faith and serious contemplation of litigation. Given did *not* declare he was seriously and in good faith contemplating litigation when he made his alleged misrepresentations; and he had no reason to believe litigation would result from the communications here because the parties "could well have negotiated a settlement and obviated any need" for litigation. (*Mission Beverage Co. v. Pabst Brewing Co., LLC* (2017) 15 Cal.App.5th 686, 704.) Given's bombastic and disproportionate response to an email not even directed to his client is not a communication made in good faith and serious contemplation of litigation but an attempt to dissuade the plaintiffs from making any further inquiries.

17

We conclude Given's letter was not prelitigation conduct protected under the anti-SLAPP statute.

C. Fourth Cause of Action

Plaintiffs' fourth cause of action, for aiding and abetting fraud, is predicated on different conduct. In this claim, plaintiffs contend Loeb & Loeb "knew that Sadleir was going to commit fraud against Plaintiffs because they represented Sadleir as well as the Aviron Entities and Clarius Entities in transactional and litigation matters. In fact, Defendant[] assisted with the formation of the Aviron Entities and ultimately advised Sadleir on the BlackRock funding. Defendant[] [was] therefore privy to Sadleir's plan to form the Aviron Entities to continue marketing and distributing film projects that he initially undertook through the Clarius Entities. [¶] Defendant[] helped Sadleir form the Aviron Entities to continue marketing and distributing film projects that he initially undertook through the Clarius Entities, with the knowledge and intention that formation of the Aviron Entities was done, in part, to avoid Sadleir's contractual obligation to pay Plaintiffs pursuant to the Consulting Fee Agreement."

This allegedly wrongful conduct precedes Given's letter and has no connection to protected activity; in this cause of action, the letter is essentially the external-facing cover-up of Loeb & Loeb's previous actions aiding and abetting Sadleir's fraud. While the cause of action is not a model of clarity, as it pivots from these allegations to allegations of reliance on Given's representations, this cause of action nonetheless alleges Given aided and abetted Sadleir's alleged fraud by means of wrongful conduct entirely separate from the later letter.

18

In their anti-SLAPP motion, Loeb & Loeb made no effort to demonstrate that this conduct was protected activity. In fact, they did not acknowledge these allegations, instead asserting that each cause of action "seeks to hold Loeb liable for statements made by Given in his March 28, 2018 correspondence" and that "[t]he only thing Loeb is alleged to have done is to send a single letter on behalf of Aviron, its client." Therefore, while we hold the causes of action were not subject to dismissal under the anti-SLAPP law because Given's letter was not protected prelitigation activity, we hold that dismissal of the fourth cause of action in its entirety was error for the additional reason that it contains allegations of nonprotected conduct that survive any anti-SLAPP analysis. (*Bonni, supra,* 11 Cal.5th at p. 1010; *Baral v. Schnitt* (2016) 1 Cal.5th 376, 393, 396 (*Baral*) [an anti-SLAPP motion may be used to attack parts of a count as pleaded; unprotected activity is disregarded and the anti-SLAPP analysis is performed with regard to the protected activity].) "[B]y its very terms, section 425.16 does not apply to activity that is not in furtherance of the constitutional rights of free speech or petition." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 324.)

III. **Second Prong**

While our conclusion that the causes of action asserted in the amended complaint arise from conduct that is not protected is determinative of this appeal, we discuss the second prong because even if Loeb & Loeb did carry its burden to make a prima facie showing that the claims alleged in the amended complaint arose from protected activity, the plaintiffs made the requisite showing of merit required by the statute to survive the special motion to strike. This is equally and independently sufficient to demonstrate the anti-SLAPP motion should have been denied.

19

"[W]e may conclude a contested portion of an anti-SLAPP motion should be denied solely based on a plaintiff's showing of merit, as a sufficiently meritorious claim cannot be struck regardless of whether it arises from activity the anti-SLAPP statute protects." (*Serova v. Sony Music Entertainment* (2022) 13 Cal.5th 859, 872.)

The Supreme Court has stated, "If the defendant makes the required showing [on prong 1], the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success. We have described this second step as a 'summary-judgment-like procedure.' [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] '[C]laims with the requisite minimal merit may proceed.' " (*Baral, supra,* 1 Cal.5th at pp. 384–385, fn. omitted.)

Loeb & Loeb argues the plaintiffs cannot show a probability of prevailing on the merits because their claims are barred as a matter of law by the litigation privilege, the statute of limitations, and the absence of justifiable reliance. We find Loeb & Loeb has not defeated plaintiffs' claims as a matter of law.

A.    Litigation Privilege

"A plaintiff cannot show a probability of prevailing on the merits of a cause of action for anti-SLAPP purposes where the cause of action is barred by the litigation privilege codified in Civil Code section 47. [Citations.] 'The litigation privilege precludes liability arising from a publication or broadcast made in a judicial proceeding or other official proceeding. " 'The usual

20

formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action.' [Citation.] The privilege 'is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards.' [Citation.]" [Citation.] The litigation privilege is interpreted broadly in order to further its principal purpose of affording litigants and witnesses the utmost freedom of access to the courts without fear of harassment in derivative tort actions. [Citation.] The privilege is absolute and applies regardless of malice.' " (*Flickinger*, *supra*, 85 Cal.App.5th at p. 840.)

"A prelitigation communication is privileged only when it relates to litigation that is contemplated in good faith and under serious consideration." (*Action Apartment Assn., Inc. v. City of Santa Monica*, *supra*, 41 Cal.4th at p. 1251.) The privilege " 'arises at the point in time when litigation is no longer a mere possibility, but has instead ripened into a proposed proceeding that is actually contemplated in good faith and under serious consideration as a means of obtaining access to the courts for the purpose of resolving the dispute.' " (*Haneline Pacific Properties, LLC v. May* (2008) 167 Cal.App.4th 311, 319.) It does not apply to statements made "simply as a tactical ploy to negotiate a bargain." (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 36 (*Edwards*).)

We are not persuaded Given's letter is protected by the litigation privilege. Given's representations did not relate to litigation that was contemplated in good faith and under serious consideration. The premise of Loeb & Loeb's litigation privilege

21

argument is that the plaintiffs' email was an explicit threat of litigation, and from that they reason their letter responded to that explicit threat of litigation and was therefore written in anticipation of that threatened litigation, satisfying the good faith and serious consideration requirement.  But this premise is incorrect.  As discussed above, the email to which Given responded with his letter did not contain any threat: it was a request to a third party for help obtaining money the plaintiffs believed they were owed—in order to *avoid* litigation.

At most, the email alerted Given to a potential dispute with plaintiffs that at some point, if not resolved through negotiation and mutual agreement, could possibly develop into a lawsuit. That is not enough to invoke the litigation privilege.  (*Edwards*, *supra*, 53 Cal.App.4th at p. 36 [the "mere potential or 'bare possibility' that judicial proceedings 'might be instituted' in the future is insufficient to invoke the litigation privilege"].)  As the *Edwards* court explained, "In the present litigious society, there is always at least the *potential* for a lawsuit any time a dispute arises between individuals or entities.  More than a mere possibility or vague 'anticipation' of litigation must be required for the privilege to attach, or else the privilege may be misused in ways for which there is no public policy justification or purpose. . . . [T]he 'bare possibility' that a judicial proceeding 'might be instituted' in the future 'is not to be used as a cloak to provide immunity' for fraud and other tortious conduct when the possibility has not ripened into a *proposed* judicial proceeding that is contemplated in good faith and under serious consideration." (*Id*. at p. 33.)

B.    Statute of Limitations

Loeb & Loeb contends the causes of action were barred by the three-year statute of limitations applicable to fraud claims. (§ 338, subd. (d).)  A cause of action for fraud accrues when the injured party could have discovered the fraud or mistake through the exercise of reasonable diligence (*Sun'n Sand, Inc. v. United California Bank* (1978) 21 Cal.3d 671, 701, superseded by statute on other grounds as stated in *Mills v. U.S. Bank* (2008) 166 Cal.App.4th 871, 883), and actual knowledge is not required for accrual if "a plaintiff knows facts that should raise suspicion and trigger a further investigation."  (*Vera v. REL-BC, LLC* (2021) 66 Cal.App.5th 57, 69.)

Loeb & Loeb argues plaintiffs already suspected Sadleir controlled Aviron in 2017, as demonstrated by their 2017 communication with Sadleir asking about payment.  This suspicion, Loeb & Loeb contends, obligated plaintiffs to investigate, and their minimal investigation was not reasonably diligent as a matter of law.  Loeb & Loeb argues plaintiffs did not allege they took any steps "to ascertain Sadleir's relationship with Aviron beyond a single inquiry to each of Sadleir and BlackRock.  Plaintiffs do not purport to have searched publicly available materials, to have requested copies of the financing agreements or any corporate records, or to have done anything else to investigate their suspicion" that Sadleir controlled Aviron.  Had plaintiffs searched these materials, Loeb & Loeb represented to the trial court, "they would readily have discovered not only that Sadleir controlled Aviron, but also all of the other

23

information that was supposedly 'unearthed' during the BlackRock lawsuit."[3]

Specifically, Loeb & Loeb asserted in support of their anti-SLAPP motion that with "a few simple internet searches," plaintiffs would have discovered: (1) a 2015 press release from a Canadian company, Quizam Media Corporation, announcing it had signed a letter of intent to acquire an equity interest in "Sadleir's new motion picture distribution company, headquartered in Beverly Hills, California," of which Sadleir was presently the only other shareholder; (2) Quizam's 2015 filing with SEDAR, which Loeb & Loeb described as the Canadian equivalent of the Securities and Exchange Commission's EDGAR filing system, disclosing it had entered into an agreement with Sadleir and Aviron to acquire an interest in Aviron; and (3) three of Quizam's Consolidated Financial Statements covering the years 2014 through 2016, and its 2015 Management's Discussion & Analysis form, each of which mentioned Quizam investing in "William Sadleir's new motion picture distribution company, Aviron Capital, LLC." Loeb & Loeb also asserted that plaintiffs would have found a January 2017 Nasdaq.com article, articles from May 2017 and November 2017 from Deadline Hollywood, and Aviron's website. According to a declaration by Loeb &

---

[3] Perhaps sensing an overstatement, Loeb & Loeb moderated that assertion on appeal, stating that investigation of publicly available documents would have told plaintiffs "that Sadleir exercised at least indirect control over the company."

Loeb's counsel, these articles and website printouts were attached to the declaration, but they are not in the record.[4]

Loeb & Loeb's argument is unavailing. If the plaintiffs suspected Sadleir controlled Aviron as of 2017 or their inquiries in 2018, that would allow a fraud claim *against Sadleir* to have accrued at that time. But these are claims against Loeb & Loeb, based not on Sadleir's fraud but on Loeb & Loeb's conduct: making allegedly false representations about Sadleir, Aviron, and Clarius, as well as whether the 2014 consulting fee agreement entitled plaintiffs to payment. Suspecting they might be owed money under the agreement is not sufficient to put plaintiffs on notice that a letter from Aviron's attorney specifically dispelling that suspicion may have contained false representations.

Even if plaintiffs were required to investigate Given's representations in the letter because before receiving it they thought they were or could be entitled to payment, there is no evidence that a reasonable investigation would have revealed

---

[4]     According to Loeb & Loeb, one of these articles mentioned "the October 2015 Share Exchange agreement between Quizam and Aviron and William Sadleir" (the January 2017 article); another stated Aviron Pictures had been formed with funding from "Aviron Capital, a consortium of financiers including principal William Sadleir" (the May 2017 article); and the third described Aviron as "a consortium of financiers including principal William Sadleir, who is chairman/CEO" (the November 2017 article). Loeb & Loeb also described printouts from Aviron Pictures's website as identifying Sadleir as "previously CEO of Clarius Entertainment" and Aviron's "Chairman & CEO"; describing the company's business model in similar terms to that of Clarius Capital; and identifying various former Clarius executives as members of Aviron's senior management team.

Given had made false representations to them. "The mere fact that information exists somewhere in the public domain is by no means conclusive." (*Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282, 295.) The "reasonable" investigation proposed by Loeb & Loeb would have involved rooting through government filings and financial statements made by a Canadian company, an investigation significantly deeper than the "simple internet searches" Loeb & Loeb claimed would have yielded this information. While a single phrase in Quizam's 2015 press release did say Sadleir's new company had no other shareholders, we are not convinced that plaintiffs should be charged with locating a single phrase in an unrelated company's press release that did not even mention Aviron by name, simply calling it "New Company."

More importantly, none of the documents identified by Loeb & Loeb would have revealed to plaintiffs that Given's letter contained misrepresentations. The Canadian company documents simply referred to negotiations and an agreement to acquire an interest in Aviron, referred to as "Sadleir's new motion picture distribution company." While, as noted above, the Canadian company's 2015 press release contained a statement that Sadleir's unnamed new company had no other shareholders, his full ownership of Aviron in 2015 does not mean that at other times Sadleir owned all of Aviron—in fact, the Quizam documents suggest Sadleir later did not own Aviron in its entirety, since they announce and concern Quizam's purchase of an ownership interest in Aviron. While we were not provided with the remaining items Loeb & Loeb says a basic investigation would have uncovered, based on its description of them they similarly would not have been enough to alert plaintiffs, or any

26

reasonable person, that Given's various representations about Sadleir, Aviron, and Clarius may have been false.

We also note that Given declared that at the time he wrote the letter, he believed his representations were accurate. If Given, who as Sadleir and Aviron's attorney had access to not only all the information in the public record, but also his "confidential communications with Mr. Sadleir in his capacity as an Aviron employee and other confidential information that Loeb received from Aviron in the course of its representation," was not able to detect that his statements were false, this both undermines any claim that plaintiffs should have been on notice that Given's statements might be misrepresentations and strongly suggests they would not, exercising reasonable diligence, have discovered the letter contained false statements.

Accepting plaintiffs' evidence as true, it is reasonable to conclude plaintiffs were not aware of the alleged misrepresentations in Given's letter until the documents were revealed in the BlackRock litigation. As the trial court noted, the fact that they did not file suit until those documents became available is evidence that they had not been aware of the fraud. The causes of action are not barred by the statute of limitations.

C.  <u>Justifiable Reliance</u>

In a rather bleak argument, Loeb & Loeb argues plaintiffs cannot prove they justifiably relied on Given's representations because as a matter of law it was not justifiable to rely on the representations he made as counsel for Aviron.

Loeb & Loeb argues it is "not reasonable under California law for a party to actual or threatened litigation to accept the other side's 'representations as an adversary without an independent inquiry' " (italics omitted), but the case upon which

27

it relies does not stand for such a broad principle. In *Wilhelm v. Pray, Price, Williams & Russell* (1986) 186 Cal.App.3d 1324, opposing counsel in pending litigation was alleged to have met with the plaintiff, an 87-year-old woman, and made false representations that convinced her to dismiss her pending litigation. (*Id*. at pp. 1328–1329, 1331.) The court sustained demurrers to the operative complaint on multiple grounds, one of which was that the allegations precluded a showing of actual or justifiable reliance. (*Id*. at p. 1332.) The court pointed out that plaintiff had been represented by counsel, and it stated, "Because her counsel prepared and filed the dismissal, she must have consulted with [her counsel] before hand. Also, it would not be 'reasonable' for [her] to accept [opposing counsel's] representations as an adversary without an independent inquiry." (*Ibid*., italics omitted.)

While it may not be reasonable for a person represented by counsel and engaged in litigation to rely on representations made by opposing counsel about why they should drop their pending lawsuit, that is not the case here. There was no obvious reason for plaintiffs to consider Given an adversary. They were not litigating against one of Given's clients; they simply asked a third party for help obtaining money they thought was due to them, and in return they received Given's letter making representations about Sadleir, Aviron, and Clarius and denying plaintiffs had any entitlement to money under the consulting agreement. As the situations here and in *Wilhelm* markedly differ, *Wilhelm* does not demonstrate that the plaintiffs could not justifiably rely on Given's representations as a matter of law.

Loeb & Loeb next cites three federal district court cases that also do not tend to establish plaintiffs' reliance was unjustifiable as a matter of law. Two, *Borg v. Principal Life Ins. Co.* (N.D.Cal., July 24, 2008, No. C 07-03149 JW) 2008 WL 11453724 and *Facebook, Inc. v. ConnectU, Inc.* (N.D.Cal., June 25, 2008, No. C 07-01389 JW) 2008 WL 8820476, state, "Where a party is represented by counsel, or where the alleged misrepresentation was made by an adversary during the course of negotiations, courts have held that reliance is unjustifiable." (*Borg*, at p. *3; *Facebook*, at p. *5.) There is no evidence that plaintiffs were represented by counsel on this matter, and Given's alleged misrepresentations were not made during negotiations. In the third case, the plaintiffs were "sophisticated businessmen who were represented by counsel during the negotiation, preparation, and execution of [a] merger agreement" and then alleged fraud during the negotiations. (*Scognamillo v. Credit Suisse First Boston LLC* (N.D.Cal., Aug. 25, 2005, No. C03-2061 TEH) 2005 WL 2045807, p. *7.) Given the plaintiffs' sophistication and representation, the court held they could not "demonstrate that, in the absence of a fiduciary relationship, reliance on statements made by individuals on the other side of a business transaction would have been justified in light of Plaintiffs' knowledge and experience." (*Ibid*.) Again, that is not remotely akin to the factual situation here and does not suggest, let alone establish, that plaintiffs' reliance was unjustifiable as a matter of law.

In *Cicone v. URS Corp.* (1986) 183 Cal.App.3d 194, 205, the court rejected the proposition that an attorney " 'is not justified in relying on statements of law made by an adverse party or attorney in the course of arm's length negotiations,' " and the

29

court in *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2003) 107 Cal.App.4th 54, 75, observed that " 'cases from twenty-eight states hold[] that "[a]n attorney can be liable to a nonclient, even an adversary in litigation, for fraud or deceit." ' " In *Shafer*, the attorney for the defendants' insurance company misrepresented the scope of the insurance company's coverage. (*Ibid*.) The court ruled the plaintiffs "justifiably relied on [the attorney's] alleged false statements. They had no reason to doubt him. . . . [They] reasonably relied on the coverage representations made by counsel for an insurance company." (*Id*. at pp. 75–76.)[5] Similarly here, accepting plaintiffs' evidence as true, they reasonably relied on representations concerning Aviron's ownership, control, and obligations made by counsel for that company.

Loeb & Loeb claims it was "unreasonable as a matter of law" for plaintiffs to rely on Given's representations without independent inquiry because "plaintiffs *actually* believed that Sadleir controlled Aviron and that they were therefore entitled to payment under the Consulting Fee Agreement, and they threatened legal action on that basis." The portions of the record Loeb & Loeb relies upon to support that assertion do not bear it out. Loeb & Loeb cites to the email plaintiffs sent to BlackRock, which does not state or necessarily imply they believed Sadleir controlled Aviron; and, as we have already discussed, was not a threat of legal action. Loeb & Loeb also refers the court to the declarations of Quraishi and Kennedy, both of which describe

---

[5] Loeb & Loeb attempts to distinguish this case by asserting, inaccurately, that the misrepresentation upon which the *Shafer* plaintiffs relied was made by "*plaintiff's own counsel*."

30

Quraishi's inquiries with Sadleir and BlackRock, and neither of which establishes they believed Sadleir controlled Aviron and that this entitled them to payment under the consulting agreement. This argument does not establish that plaintiffs' reliance was unjustifiable as a matter of law.

The reasonableness of reliance is a question of fact, and it may only be decided as a matter of law " 'if reasonable minds can come to only one conclusion based on the facts.' " (*Hasso v. Hapke* (2014) 227 Cal.App.4th 107, 132.) Loeb & Loeb has not demonstrated that reasonable minds could only conclude the plaintiffs' reliance on Given's representations was unreasonable. Loeb & Loeb argues "the most basic of inquiries would have revealed the true facts," but that both assumes a duty on plaintiffs' part to perform this research—a duty Loeb & Loeb has not established—and fails to answer the question why plaintiffs would or should have thought they needed to verify the unsolicited representations about Aviron made by its attorney, whose knowledge of the company and its structure, ownership, and obligations was considerably more extensive than theirs. Moreover, as discussed above, the evidence does not show that if the plaintiffs had performed the research Loeb & Loeb claims they should have performed, they would have located information revealing Given's representations to them were false. To the contrary, it strongly suggests that even in the exercise of reasonable diligence they would not have learned Given had made misrepresentations to them.

We agree with the trial court that plaintiffs' evidence was "certainly not insubstantial and raises a reasonable doubt as to whether Given was truly ignorant of his letter's falsity." Plaintiffs submitted evidence that Given made representations of

important facts to plaintiffs; he knew those representations to be false at the time he made them, and he intended for plaintiffs to rely upon them and stop inquiring about payment; and that plaintiffs believed Given and reasonably relied on his representations to their detriment, suffering economic damages as to which the misrepresentations were a substantial cause. In light of this evidence, and because the claims are not barred as a matter of law, we conclude the plaintiffs have "made a prima facie factual showing sufficient to sustain a favorable judgment." (*Baral*, *supra*, 1 Cal.5th at p. 385.)

## DISPOSITION

The judgment is vacated and the order granting the special motion to strike is reversed. On remand, the trial court is directed to enter an order denying the motion. Appellants shall receive their costs on appeal.

**CERTIFIED FOR PUBLICATION**

STRATTON, P. J.

We concur:

WILEY, J.                    VIRAMONTES, J.